If counsel will come forward, please. Mr. Donovan, would you like to reserve some time? I would, Your Honor. I'd like to reserve two minutes, if I may. Okay. We'll put eight on the clock. Eight on the clock, please. Okay. You're on. All right. Thank you. May it please the Court, I represent Joseph Ackerman, the defendant appellant. My client, Mr. Ackerman, was told that he'd be free to leave. You'll be free to leave as soon as you get your documentation back. After he got his driver's license and other documents back, Mr. Ackerman was requested to answer questions and to step out of his vehicle for a second, quote, unquote. Four minutes later, four minutes after he stepped out of his vehicle, two other troopers arrived on the scene. They had their weapons exposed at their waist, and they surrounded Mr. Ackerman. Over 25 minutes after he was initially stopped for speeding and 17 minutes after he had stepped out of his vehicle, Mr. Ackerman asked, so am I free to leave? And he was told, you are free to leave. I'm not detaining you at all at this point, at all right now. We've cited seven cases, five from state supreme courts, two federal. The federals are from two cases from the Eighth Circuit. In all those cases, the drivers were told, you're free to leave, but never given the opportunity to leave. And that was a distinguishing factor in those cases that ultimately held that the evidence must be suppressed. In any of those cases, did the officer admit in the course of the proceedings that if the person had said, no, I'd prefer to travel on now, what he would have done? I don't recall that admission in any of those cases, Your Honor. Do we know the answer to that question here? Was he asked that? He was not. And so we don't know what would have happened if your client had said, thank you very much, but I'd prefer to just drive on down the highway. No, we don't know what would have happened. The government argued in the district court that there was reasonable suspicion to detain. I argued in my brief that there's not, and the district court did not rule on the reasonable suspicion issue. What do you do with footnote six of the district court's opinion? Pardon me? What do you do with footnote six? What do I do with footnote six? In the district court's opinion, the court says, nevertheless, at that point, let's see, it says a reasonable person in Ackerman's position would not have felt free to leave. That's when the two officers arrived. Nevertheless, at that point, Trooper Keith had developed further reasonable suspicion of drug activity to prolong the encounter. Well, I contend that the reasonable suspicion didn't develop until after he stepped out of the vehicle was questioned. At the point he stepped out of the vehicle, they said nervousness, but there are several cases saying that nervousness is common when people are stopped by an officer, and that Mr. Ackerman in particular was shown to be a nervous person. Secondly, the anonymous tip that the officer had was really proven to be only partly or half right. It was pretty on, wasn't it? Right. I mean, this was a pretty good tip. It wasn't 100 percent on in Oliver's particulars, but it was pretty darn close. Well, it was darn close, but they had the wrong vehicle. There was no toolbox, and there was no mission. It had a pretty unique name, though. No mission of a passenger. A lot of people named Vaughn up in Montana. Wasn't that the name they were looking for? That's right. That's where he was from. And I would just add that the case of Florida v. J.L. does indicate that mere knowledge of future movement does not mean that a person has knowledge that there's contraband in the vehicle. Suppose at the moment that Officer Keith gave your client the warning, instead of what transpired here, that Officer Keith had said, Mr. Ackerman, I'm giving you a warning, and by the way, I'm going to detain you, because based on some information I have, I believe that you may be transporting illegal narcotics in this vehicle, so I'm going to detain you and impound your vehicle while I attempt to get a search warrant, unless you consent to a search. Would the case be different? So your question would be if the trooper actually told him, I am detaining you? Yeah. I think it would be different, because instead of telling him that, he told him he was free to leave, but his actions were different. He wasn't permitted to leave. And I think it's an important factor that he was outside the vehicle, and he really couldn't leave. How could he drive away if he's outside the vehicle? So he really is detained or restrained from leaving at that particular point. Now, I sent in a 28-J letter on the Craighead case, and I think there's some similar facts there. In Craighead, as here, the individual was told he was free to leave, and our court, Judge Malloy below, considered that to be a very important factor, but I think our court below did not consider that he wasn't given time to leave. In Craighead, Mr. Craighead was not handcuffed or physically restrained. That's the same thing here with Mr. Ackerman. Unlike Craighead, Mr. Ackerman was never informed that the questioning was voluntary. And like Craighead, I believe it was objectively reasonable for Mr. Ackerman to consider himself effectively under guard as he was surrounded by two other troopers after he got out of his vehicle. Like Craighead, Mr. Ackerman was prevented from leaving, and he could not, again, get in his car and drive away. And I think the Craighead case points out the issue that we're going by, basically. What would a reasonable person have felt? Would a reasonable person have felt free to go? And we contend he would not in this situation. Suppose we were to conclude that at the moment the backup officers arrived, your client was effectively detained or seized within the meaning of the Fourth Amendment. Did Officer Keith have enough information at that point to detain your client and seek either a consent search or a warrant? We would contend not. I believe that, first off, the reasonable suspicion as well as the probable cause were not established until after the other two officers arrived. If you look at the transcript of the tape, it was after that point that the original trooper questioned the passenger and then determined in his own mind that there were inconsistent statements. And based on inconsistent statements and everything else that he had observed in the anonymous tip, he considered that he had probable cause to seize the vehicle at that time. So I think it's critical that these two other officers arrived to clearly point out that a reasonable person would think they're detained at that point outside the vehicle and surrounded by two other officers, that at that point in time there was a detention, there wasn't reasonable suspicion, and the reasonable suspicion and probable cause were not developed until later. I have to reserve my time. Thank you. Okay. You've got a full two minutes for rebuttal if you choose to use it. We'll hear from the United States at this time. Mr. Olm? May it please the Court. Curt Olme for the United States. First, addressing the factual arguments that are raised by the defendant. The first one that he raises is the initial consent. At the initial consent, Your Honor, we'd argue that he had freely consented. Again, the key facts are after the routine traffic stop, the officer came back up to the window, said, as soon as I give you your identification documents back, you're free to go. He then gave him his identification documents back. So at that point, the defendant was free to go. And then he didn't just start out asking him questions. He asked, can I ask you a few questions? The defendant said that he would answer them. And so he asked the defendant. He didn't direct him. He didn't tell him he had to, but he asked him to get out of the car, and they walked to the back of the Hummer where he asked him questions. The second point in time that was raised here was at the time the other two officers walk up. And as the judge mentioned, in footnote 6, Judge Malloy stated, well, arguably, he didn't make a finding, but he said arguably. At that point, consent ended. But at that point, he had gotten enough information out of Mr. Ackerman for reasonable suspicion to be formed in order to continue the questioning. Did you argue that even if he had been seized, that there was reasonable suspicion? Did we argue it, or am I arguing it? Well, I heard you argue it today. Did you argue it in your brief? Your Honor, we did not specifically argue reasonable suspicion in our brief. However, we did argue that the district court's decision should be affirmed. Why didn't you argue it in your brief? Your Honor, I can't answer that. The attorney on the brief is no longer with the office. Because the district court did seem to address it in footnote 6. It is not addressed in your brief, and your opponent has pointed that out in his reply brief. That's correct, Your Honor. We did argue how- Has the government forfeited the argument, then? No, Your Honor. Our position is, again, that in our brief, we did argue that the district court's decision should be affirmed. Granted, that's a pretty cursory argument, but we did argue that his decision should be affirmed, and the district court in footnote 6 did state that reasonable suspicion was the grounds was established at the point in time that the two officers walked out. When we take a look also at reasonable suspicion at that point, we argue that there is reasonable suspicion in addition to the facts I just mentioned. We also had the cumulative facts of this was in a public setting. The court had made the finding that the firearms were not-he never unholstered his firearm. He made the finding that he was never taken into custody and that he failed to present any evidence of physical force or a show of authority, which would have prevented him from feeling comfortable to leave. Now, at the time reasonable suspicion was established, what had happened was is the officer had talked to Mr. Ackerman and established three things. First of all, he had further corroborated the tip. He had found out that he owns a pickup truck. The second thing that he had done is found out that there was a suspicious story here. Mr. Ackerman said he had driven up towards the mountains in the Hummer on the way to Coeur d'Alene and turned around somewhere in the pass and spent the night in the Hummer, which the court found suspicious because it's a high-end rental. Why would you sleep in your car in February on a brisk day? And the third thing is he found suspicion, he found nervousness, and he found delay in answering questions by Mr. Ackerman that in his mind made him suggest that he was fabricating. So those three things all add to reasonable suspicion established at that point in time. Where did this stop take place? On the side of the interstate about a little bit west of Missoula. How far west? I believe the record says about 15 miles. At some point, Officer Keith told Mr. Ackerman, after he decided to impound the vehicle, that he was free to leave? He did. Where was he supposed to go? He told him that, and I'd like to address the context of that comment to directly answer your question, he told him that he would take him somewhere if he wanted to be dropped off, and I believe it was mentioned in the record that he could rent, the officer suggested he could rent another vehicle to get back to Great Falls. But the context of that, I think, is very important because at the end of this questioning, what happens is, is Officer Keith now believes he has probable cause, and so he tells Mr. Ackerman, I'm going to impound your vehicle, I'll take you wherever you want to go if you want to go somewhere. In response to that, Mr. Ackerman says, asked the question of, and I want to be sure I get this right here, asked the question, he didn't feel, let's see, I'm sorry, so I'm free to leave. And it wasn't so surprising in that context because he had just said he was going to impound the Hummer. And so in response to the question, so I'm free to leave, then Officer Ackerman goes forward and says, yes, I'm not detaining you, you are free to leave. So in the context of that conversation at the end, triggered by the statement that he was impounding the Hummer, it was not indicative of the tone of the conversation or his inability to leave up until that point, but triggered by the statement that he was impounding the vehicle that the driver was driving. When we take a look at the cases that were cited by the defendant, first of all, the Craighead case. I'd like to, that case is distinguishable. I know this Court is very familiar with that case. First of all, it doesn't, this case doesn't deal with a home interrogation setting. And the test there, of course, was whether we have a police-dominated atmosphere. The four tests that were announced in Craighead in this case are all less significant than the facts or less egregious than the facts that were found in Craighead. First of all, number of law enforcement. In this case, there was one initially and then three total, less than Craighead. Visibly armed. In this case, they were visibly armed, but there's no indication that they drew attention to their firearms in any way. And was the suspect restrained by physical force or threats? That's the second test. In this case, no. I mean, arguably when the next two officers appeared, the judge found that arguably that he may not have felt free to leave, but it certainly is a far cry from the situation of taking an individual in his home to a shed, closing the door, and having an officer stand against the door. Then was the suspect isolated from others? Well, in this case, he was asked to come out of the car and go to the back of the Hummer. But the reason for that was not to try to, as the statement in Craighead was made, to separate him from his moral support in order to force him to give inculpatory statements about some particular crime. He was asked to come to the back of the vehicle where he was just asked about his travel plans. And the reason he was asked to go to the back of the car was just so that he could the officer could then go talk to the passenger and see if they had conflicting statements, not to, again, to remove him from the moral support of the passenger who was with him in the vehicle. And finally, informed questioning. Was Mr. Ackerman informed that the questioning was voluntary, and was he informed he was free to leave? And in this case, of course, he was free to leave, and he was asked, would you answer some questions? He wasn't directed to, and he didn't just launch into asking the questions. And I think that's an important distinction in the Freeman case, Commonwealth v. Freeman, which is a case cited in both the reply brief and the opening brief by the defendant. That's the Pennsylvania Supreme Court case with facts that are fairly similar. There's a traffic stop on the highway, and the police officer comes up and gives the individual a warning, tells him he's free to leave, and then he turns to walk away. But then he comes back and asks a question and says, that other car that we stopped, are you traveling with that person? And this was the second time he had asked it. The driver said, no, I'm not. So the officer says, well, the other driver says that you are, and then asks the driver to enter or to exit the vehicle and ask for consent to search, which is given. The Supreme Court in Pennsylvania found that that was a seizure. Major distinction between that case and this case. In this case, the officer asked him if he'd be willing to answer additional questions. Didn't just, in a compelling tone, ask a question expecting an answer, but he asked him, conveying a voluntary nature to the whole transaction right in the beginning. And that also flowed through then to would you go to the back of the vehicle, although he asked him to do it first of all, but he did it on the heels of, again, asking him if he would answer questions, to which the defendant said that he would. The other cases are also distinguishable, and I recognize that we didn't do that, that the government did not do that in our brief, but quickly in the time I have remaining, in State v. Ballard, in that situation there was a false statement. The officer said, you're free to leave, asked him the question. When he didn't get the answer he wanted, he said, you're not free to leave. The court said, this is a close call, but, and again, this is a state court case. This is out of the Supreme Court of South Dakota. Said it's a close call, but we can't condone a false statement by law enforcement. Then we go to State v. Garcia, which is a Tennessee Supreme Court case. In that situation, the officer had no reasonable suspicion to stop the vehicle in the first place, so we don't have a completed Terry stop like we do in this case. Then we go to State v. Hadley, the Oregon Court of Appeals. That case is also a fairly analogous case to this on the facts. In that case, the Oregon Court of Appeals says there has to be a temporal break between when you tell the driver he's free to leave and then when you come back and ask questions. There needs to be this temporal break. But they did that, at least in part, to implement Oregon statutory law. So they created this bright-line test. And, again, I'd argue that bright-line test shouldn't apply in the Ninth Circuit. It doesn't apply in the Ninth Circuit where we have a totality of the circumstances test. We don't have this circuit or Congress, unlike the Oregon Court of Appeals found, the Supreme Court and Congress and this circuit has not ever put in such a bright-line test. And, in fact, that would change significantly the totality of the circumstances test we have now. Okay. You're out of time. Thank you. Thank you for your argument. Rebuttal. Thank you. One important point from the Craighead case is that this Court must consider the delivery of the statement you're free to leave within the context of the scene as a whole. And I've talked about that earlier, but I want to point out a couple things. First, Mr. Ackman was asked to step out of the vehicle for a second, and the second turned into minutes. Within four minutes, as I said previously, two other officers arrived. He wasn't free to go from start to finish of the stop until he was free to go for 27 minutes. Secondly, the important point from the cases I cited, and in addition the two cases from the Eighth Circuit, is that if an officer tells someone they're free to leave, they have to give the person an opportunity to leave. If they don't, then they're stuck. They're detained. And that's exactly what happened here, and that's why you should rule in our favor. What would have happened if Mr. Ackman had said, look, I'm late for the dentist. I'd love to sit up and chat, but if I'm free to go, I've got to go. I don't know. I mean, if he had stayed in the vehicle or gotten out and gotten back in and said, I'm going to go. Yeah, I'm going to go. It puts the officer to the test, doesn't it? At that point, the officer has to say, in fact, you're not free to go. And at that point, he's seized. No question whatsoever. On the other hand, if your client says, got to go to the dentist, if you're going to do something more formal, you've got to do it, but I'm on my way. Right. Well, that didn't happen, but I think the important point comes back to what would a reasonable person think in these circumstances? He's been told he was free to go, and he is in his car, and the officer is standing on the side of the road, right? I mean, if he wants to put the foot to the pedal, he's going to be able to, the last case had us eluding the officer, but he's going to be able to leave. Well, if he's still in the driver's seat, yeah, he can drive away, but the fact is the officer got him out of the car and kept him out of the car. I asked him to step out of the car after the guy consented. Right. But he said, well, he also asked him to consent to get out of the car for a second. So he consented to get out of the car for a second, and obviously it was much longer than a second. Okay. Thank you very much. Thank you both for your argument. Very interesting case. It stands submitted for decision. We'll proceed to the next case on the argument calendar, which is United States against Kaiser. Counsel will come forward.
judges: Nelson, Hawkins, Bybee